**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

**VANESSA CLERMONT, individually and on behalf of all others similarly situated,**

*Plaintiff*,

v.

**NATIONAL TENANT NETWORK, INC. and LCIJ, INC.,**

*Defendants*.

---

Civil Action No. 23-3545

OPINION

---

ARLEO, UNITED STATES DISTRICT JUDGE

**THIS MATTER** comes before the Court by way of named Plaintiff Vanessa Clermont's ("Plaintiff") Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). See ECF No 75; ECF No. 75.1 (the "Motion"). The Motion is opposed. See ECF No. 79; ECF No. 82. For the reasons stated below, the Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

Plaintiff brings this putative class action against Defendants National Tenant Network, Inc. ("NTN") and LCIJ, Inc. ("LCIJ," and collectively with "NTN," Defendants) for violations of the Fair Credit Reporting Act ("FCRA"). See generally ECF No. 18, First Am. Class Action Compl. ("Amended Complaint" or "AC"). Specifically, Plaintiff asserts that Defendants sent consumer reports in violation of the FCRA. See id. ¶¶ 1–3, 27–29, 44, 46. These alleged consumer reports are unsolicited, non-confidential postcards that contain information about a tenant's prior eviction history and are sent to the tenant's landlord (the "Postcard Reports"). See id. ¶¶ 19–26. Plaintiff seeks to represent a class of "all persons" that were "the subject of" these unlawful Postcard Reports. See id. ¶ 33; Mot. at 8.

## A.    The Parties

NTN is an Oregon-based consumer reporting agency ("CRA") with franchises across the United States.  See ECF No. 79.3, Cert. of Counsel in Supp. of Def. NTN's Opp. to Pl.'s Mot. for Class Cert. ("NTN Decl."), Ex. B ("Graves Tr.") at 7.  This includes in New Jersey, where one of its franchisees, LCIJ, operates as a CRA.  See ECF No. 79.5, NTN Decl., Ex. D ("Abramovitz Tr.") at 5–6.  NTN developed, and with the assistance of its franchisees like LCIJ continues to maintain and update, a database that is used to conduct background checks on prospective tenants and generate consumer reports about these tenants for landlords.  See Graves Tr. at 7; Abramovitz Tr. at 6–7.

Plaintiff is a former tenant at 25 Kingsley Street in West Orange, New Jersey (the "Kingsley Street Residence").  See ECF No. 79.2, NTN Decl., Ex. A ("Clermont Tr.") at 4.  She was the subject of one of Defendants Postcard Reports that was sent to the Kingsley Street Residence's landlord, Kristen Venning, after Venning initiated an eviction proceeding against Plaintiff.  See id. at 5, 16, 21–22.

## B.    The FCRA

The FCRA specifies a limited set of circumstances under which a "consumer reporting agency may furnish a consumer report" to a third party.  15 U.S.C. § 1681b(a).  A CRA is an entity that "regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties."  Id. §1681a(f).  A consumer report is

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—(A) credit or insurance to be used primarily for personal, family, or household purposes;

(B) employment purposes; or (C) any other purpose authorized under section 1681b of this title.

Id. § 1681a(d)(1).

The FCRA requires that any CRA "maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under § 1681b." Id. §1681e(a). Specifically, these procedures must "require prospective users of the information [to] identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose" (the "User Verification Procedure"). Id. They must also ensure that a CRA makes "a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing" them the consumer report to ensure the user will comply with § 1681b (the "CRA Verification Procedure"). Id.

Anyone who "willfully fails to comply with any" of the FCRA's requirements "with respect to any consumer is liable to that consumer in an amount equal to the sum of . . . any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." Id. § 1681n(a)(1)(A).

### C.    Defendants' Postcard Reports

In the 1990s, in an effort to solicit business, NTN created a flyer to mail to landlords who had initiated eviction proceedings against tenants. See Abramovitz Tr. at 8. The flyer identified prior eviction proceedings that had been filed against those same tenants and stated that NTN could have forewarned the landlord about the tenant's prior rental history if the landlord had been an NTN customer. See id. at 8, 10. NTN shared this flyer with its franchisees, including LCIJ. See id. at 8. LCIJ's President, Lawrence Abramovitz, then worked with a software developer to convert the flyers into postcards, which resulted in the creation of the at-issue Postcard Reports. See id. at 8, 12. As required by its Franchise Agreement, LCIJ sent the Postcard Report to NTN

for marketing approval.  See Graves Tr. at 14; Abramovitz Tr. at 10.  NTN approved the Postcard Report without any changes.  See Abramovitz Tr. at 10.

As with the initial flyer, the Postcard Reports are intended to serve as a marketing tool to attract new customers.  See id. at 8–9.  They are therefore sent to landlords with whom the Defendants have no prior relationship after the landlords initiate eviction proceedings against tenants who have previously had eviction proceedings filed against them.  See id. at 8, 11–13.  They are not concealed in envelopes, and therefore their contents are visible to any person that encounters the Postcard Reports while in transit.  Id. at 8.  Before sending the Postcard Reports, Defendants do not contact the landlords to confirm their identity or to certify how they intend to use the information contained in them.  See id. at 14.  Defendants also do not verify the final outcome of the prior eviction proceedings, but they recognize that the initiation of an eviction proceeding does not indicate whether the tenant was evicted from that residence.  See id. at 9–10, 16–18; Graves Tr. at 24–25; ECF No. 75.4, Decl. of Sergei Lemberg in Supp. of Pl.'s Mot. for Class Cert. ("Sergei Decl."), Ex. E ("NTN Operating Manual") at 5 ("A record on file may not always represent a disposition adverse to the consumer.  A Landlord/Tenant Civil Court Filing does not necessarily mean that the [tenant] was evicted from the apartment, found to owe rent, or in violation of other lease provisions.  Lawsuits may be filed in error or lack merit.").

The Postcard Reports follow a standard template that has not changed in any significant way since the design was initially created.  See id. at 8, 12, 15.  Each Postcard Report is addressed to the current tenant's landlord and states the tenant's name, the date the prior eviction proceeding was filed against the tenant, and the identity of the prior eviction filer.  See Sergei Decl., Ex. A ("Postcard Report Template") at 3.  It then states that this information is the same type of "tenant information" Defendants convert into a "rental recommendation" for subscribers, and that "NTN

would have warned you about trouble tenants like this BEFORE they became YOUR residents" if the current landlord was a customer.  Id.; see also Abramovitz Tr. at 9.

Defendants, through LCIJ, send an average of 200 to 500 Postcard Reports to landlords each week.  See id. at 14.  They also maintain records of all landlords that have been sent the Postcard Reports and of the tenants that are identified in the Postcard Reports.  See id.  These records indicate that between June 2021 and June 2023, Defendants sent out approximately 50,000 Postcard Reports.  See id.

### D.    Plaintiff's Experience with a Postcard Report

From April 2022 to July 2023, Plaintiff was a tenant at the Kingsley Street Residence.  See Clermont Tr. at 4.  There were three total tenants.  See id. at 5.  Each tenant had their own mailbox. See id.  The building's landlord, Kristen Venning, did not live in the building but also maintained her own mailbox at the property where she would retrieve mail.  See id. 4–5, 29–30.

In November 2022, Venning initiated an eviction proceeding against Plaintiff.  See id. at 5. Two months later, while that proceeding was ongoing, Defendants sent Venning a Postcard Report. See id. at 23, 25; see also Sergei Decl., Ex. H ("Clermont Postcard Report") at 2.  The Clermont Postcard Report was generated from the Defendants' Postcard Report Template.  See Abramovitz Tr. at 17.  It also identified Plaintiff by name, stated a prior eviction proceeding was initiated against the Plaintiff by a different landlord in 2020, and identified the name of Plaintiff's former landlord.  See Clermont Postcard Report at 3.

Prior to sending the Clermont Postcard Report, Defendants identified Venning as Plaintiff's landlord.  See Abramovitz Tr. at 17.  They also believed that the Kingsley Street Residence was Venning's address and addressed the Clermont Postcard Report to Venning.  See id.; Clermont Postcard Report at 2.  Defendants had no prior business relationship with Venning

and did not attempt to contact Venning or determine how Venning may use the information contained in the Clermont Postcard Report prior to sending it.  See Abramovitz Tr. at 18.

The Clermont Postcard Report was left on top of a stack of mail delivered at the front door of the Kingsley Street Residence.  See Clermont Tr. at 17.  When going to retrieve her mail, Plaintiff noticed the Clermont Postcard Report referenced her and her prior 2020 eviction proceeding and took it with her other mail.  See id. at 17–18, 30.  Venning therefore did not take possession of it.  The 2020 eviction proceeding did not result in Plaintiff's eviction from her previous residence because Plaintiff reached a settlement with the landlord while the proceeding was ongoing.  See id. at 25.  The Postcard Report did not contain any information about the outcome of the prior eviction proceeding.  See Clermont Postcard Report at 2–3.

## II.    PROCEDURAL HISTORY

On June 30, 2023, Plaintiff filed the initial putative class action complaint against NTN.  See ECF No. 1.  In January 2024, she filed the operative Amended Complaint against both NTN and LCIJ.  See ECF No. 18.

Plaintiff alleges that the Postcard Reports constitute "consumer reports" that were sent to third parties in violation of the FCRA.  See AC ¶¶ 2–3, 20–22, 26.  Specifically, she claims that Defendants sent the Postcard Reports to landlords as a marketing tool "to drum up new business" and obtain new "potential customers," which is beyond the scope of the permissible bases enumerated in § 1681b.  Id. ¶¶ 2–3, 44, 46.  She further claims that before sending the Postcard Reports, Defendants failed to:  (1) abide by the User Verification Procedure and require the landlords to identify themselves, certify what they intended to do with the eviction information included in the Postcard Reports, and certify the information would not be used for any other purpose, see id. ¶¶ 27, 44; and (2) abide by the CRA Verification Procedure and take steps to verify that these presumed landlords were in fact landlords and that they would only use the information

for the reasons they were required to provide, see id. ¶¶ 28, 44, in violation of § 1681e(a).  She asserts that the open and unsealed nature of the Postcard Reports, and the statements included therein labeling the tenant a "trouble tenant" about whom the landlord should have been forewarned, "bear[s] negatively on Plaintiff's [and the class members'] reputation and creditworthiness" and causes reputational harm and embarrassment.  Id. ¶¶ 2, 22, 32, 45.

The Defendants moved to dismiss the Amended Complaint.  See ECF Nos. 33, 41.  The Court denied the motion to dismiss in its entirety.  See ECF No. 47.  The Parties then proceeded to engage in discovery.

On May 30, 2025, Plaintiff filed the instant Motion seeking class certification under Rule 23.  Plaintiff seeks to certify a class including

> [a]ll persons who were the subject of Defendants [NTN's] and [LCIJ's] postcards, substantially similar to the postcard concerning Plaintiff, sent during the FCRA statute of limitations period, 15 U.S.C. § 1681p.

AC ¶ 33; see also Mot. at 8.

## III.    LEGAL STANDARD

To be certified, a "putative class must satisfy the four requirements of Rule 23(a)"— (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation—"and the requirements of either Rule 23(b)(1), (2), or (3)."  Marcus v. BMW of N. Am., 687 F.3d 583, 590 (3d Cir. 2012); see also Fed. R. Civ. P. 23.  Here, Plaintiff seeks certification under Rule 23(b)(3), which permits certification if:  (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" (the "predominance" requirement); and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "superiority" requirement).  Fed. R. Civ. P. 23(b)(3).  Within Rule 23's class certification standard, the Third Circuit has also recognized an "implicit ascertainability requirement."  Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015).  Ascertainability must be

considered "[p]rior to determining whether the requirements of Rule 23 have been met." Carney v. Goldman, No. 15-260, 2018 WL 2441766, at *10 (D.N.J. May 30, 2018).

A plaintiff bears the burden of demonstrating that each of these requirements are satisfied by a preponderance of evidence. See Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013). In deciding whether to certify a class, the Court's analysis often overlaps with "the merits of the plaintiff's underlying claim[s]." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011). However, the Court may only consider merits questions "to the extent . . . that they are relevant to determin[e] whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013).

## IV.    DISCUSSION

### A.    Scope of the Proposed Class Under Rule 23

Before addressing the requirements for class certification, the Court must preliminarily address the proposed class definition. "An order that certifies a class action must define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). Specifically, "the text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues, or defenses to be treated on a class basis. Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187–88 (3d Cir. 2006).

Here, Plaintiff seeks to certify a single class consisting of persons that were "the subject of" Postcard Reports substantially similar to the Clermont Postcard Report in violation of §§ 1681b and 1681e(a) during "the FCRA statute of limitations period." See AC ¶¶ 33, 46. Depending on each class member's circumstances, the applicable "FCRA statute of limitations period" may be different because the FCRA imposes two alternative statute of limitations periods. A plaintiff must either bring a claim for a violation under the FCRA within two-years of "the date of discovery by

the plaintiff of the violation that is the basis for such liability," or within five-years "after the date on which the violation that is the basis for such liability occurs," whichever comes first. 15 U.S.C. § 1681p(1), (2); see also Dukes v. N.J. Transit Corp., No. 16-8947, 2018 WL 1378726, at *6 (D.N.J. Mar. 19, 2018).

It is plausible that potential class members may fall within either statute of limitations period. Plaintiff exemplifies someone that discovered the purported FCRA violation, and therefore would have been subject to the two-year statute of limitations. However, because the Postcard Reports were intended to be sent to class members' landlords, the proposed class likely involves many members who are unaware that they were "the subject of" the Postcard Reports (and, in turn, an FCRA violation). See Mot. at 32–33. This means they would be subject to the longer five-year statute of limitations.

Despite the fact that two potential statutes of limitations may apply to class members, the Court finds that the class is ascertainable. See infra at 10–11 & n.1. To ensure the class is "clear" and "precise" in light of this potential ambiguity, Wachtel, 453 F.3d at 187, the Court modifies the proposed class definition to specify that the class includes all persons that were "the subject of" a Postcard Report that is substantially similar to the Clermont Postcard Report and was "sent during the applicable FCRA statute of limitations period, 15 U.S.C. § 1681p, as determined by whether and when the person that was the subject of one of Defendants' postcards discovered that it was sent." Based on the date Plaintiff initiated this action, the applicable Class Period (depending on each class member's circumstances) would either be June 30, 2018 to June 30, 2023 (if discovery of the violation did not occur before the case was initiated), or June 30, 2021 to June 30, 2023 (if discovery of the violation occurred before the case was initiated).

B.       **Ascertainability**

A class is ascertainable if:  (1) it can be "defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  Byrd, 784 F.3d at 163 (internal citation and quotation marks omitted).  A class can be defined with reference to objective criteria if class membership is based on factual considerations and not on legal conclusions.  See Bedoya v. Am. Eagle Express, Inc., No. 14-2811, 2022 WL 3443983, at *15 (D.N.J. Aug. 17, 2022).  The mechanism presented to determine class membership does not need to "be able identify all class members at class certification"; instead, it "need only show that class members can be identified." Hargrove v. Sleepy's LLC, 974 F.3d 467, 482 (3d Cir. 2020) (quotation marks omitted).

Here, ascertainability is satisfied.  First, Plaintiff's proposed class is defined by reference to objective criteria.  It includes any person that was "the subject of" (i.e., identified by name in) one of Defendants' Postcard Reports if the Postcard Report:  (1) is substantially similar to the Clermont Postcard Report; and (2) was sent within the applicable FCRA statute of limitations period.  See AC ¶ 33.  Each of these criterium present factual questions.  See Bedoya, 2022 WL 3443983, at *15.  Either a person's name was included as the subject of a Postcard Report, or it was not.  Either the Postcard Report was based on the same general template used for the Clermont Postcard Report, or it was not.  Either the Postcard Report was sent during the statute of limitations period applicable to each class member, or it was not.  If the answer to each question is yes, the person is objectively within the scope of the proposed class; if the answer to any question is no, the person must be excluded from the proposed class.

Second, class members can be identified through an administratively feasible mechanism—Defendants' archived records.  Specifically, LCIJ's President testified that Defendants maintain a record of:  (1) the date on which each Postcard Report was sent; (2) the

tenant referenced in the Postcard Report; and (3) the landlord to whom the Postcard Report was sent. See Abramovitz Tr. at 14, 19. He also testified that Defendants can generate a report that includes this specific information for all Postcard Reports sent between a certain time period, and that in response to this litigation, Defendants have already generated such a report for all Postcard Reports sent between June 30, 2021 and June 30, 2023. See id. at 14. Plaintiff represents that she has received a redacted version of this report. See Mot. at 24 n.7. The admitted existence of these records, coupled with Defendants' redacted production, "confirms the existence of a reliable and administratively feasible mechanism" to identify class members. Fogg v. Clean Harbors Env't Servs., Inc., No. 21-7626, 2025 WL 2158455, at *7 (D.N.J. July 30, 2025) (finding ascertainability requirement satisfied where the plaintiffs sought certification of a class including any employee that worked at one of the defendant's New Jersey facilities where the defendant admitted employment records existed to verify where each employee worked and had produced a limited list of these records to the plaintiffs).[1] Therefore, the proposed class is ascertainable.[2]

---

[1] The Court further concludes that the class is ascertainable in light of the variability that may be generated by the FCRA's competing statute of limitations periods. Whether a class member discovered the Postcard Report was sent (and that an alleged FCRA violation therefore occurred) is an objective question of fact. Whether that class member is therefore subject to the two-year or five-year statute of limitations period is also an objective question of fact. Determining whether each potential class member's claim is time-barred is also administratively feasible. Defendants have been sending Postcard Reports to landlords for more than two decades. See Abramovitz Tr. at 8, 10. LCIJ's President testified that Defendants maintain archived records regarding all Postcard Reports that are sent; that these records contain information about the tenants that are "the subject of" the Postcard Reports; and that Defendants can generate a report of Postcard Reports that LCIJ sent across a certain time period. See id. at 14. Indeed, they have already generated this report for the two-year statute of limitations period. See id. To ascertain the potential class, Defendants could generate an expanded report dating back to June 30, 2018 to account for the five-year statute of limitations period. Class notice could then be sent to all tenants identified in this report. And the class notice process could require each class member to certify if and when they learned of the Postcard Report. Any potential class member that was sent a Postcard Report before June 30, 2021 that certifies they were in fact aware of the Postcard Report would then be excluded from the class under the proposed class definition, based on the applicable statute of limitations period.

[2] NTN argues that the class is not ascertainable because it consists of individuals who allegedly "received" a Postcard Report, but the record is unclear on who actually received Postcard Reports, how or where they were delivered, or whether they were ever seen by the intended recipients. Moreover, Defendants do not maintain records of recipients.

### C.    Rule 23(a) Requirements

#### 1.    Numerosity

Numerosity is satisfied if the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); see also Elias v. Ungar's Food Prods., Inc., 252 F.R.D. 233, 242 (D.N.J. 2008) ("To be certified, a class must be large enough in number to ensure that, for efficiency purposes, a class does not subject the defendants to multiple, similar lawsuits."). There is no minimum number of members necessary to satisfy this requirement, "but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," numerosity is met. Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001).

Here, Defendants do not challenge class certification on numerosity grounds. According to Defendants records and generated report, the class consists of nearly 50,000 members. See Abramovitz Tr. at 14. Given this estimate, "joinder of all members" would be "impracticable," Fed. R. Civ. P. 23(a)(1), and a class action will ensure Defendants are "not subject[ed] . . . to multiple, similar lawsuits." Elias, 252 F.R.D. at 242. The Court therefore finds that numerosity is satisfied.

#### 2.    Commonality

Commonality is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Third Circuit has described this requirement as "straightforward," explaining that it is "satisfied if the named plaintiffs share at least one question of fact or law with

---

Therefore, determining who is part of the class would require individualized inquiry about who received the Postcard Reports. NTN's argument misses the mark because it is based on a misinterpretation of the proposed class. The proposed class seeks to include all persons that were "the subject of" a Postcard Report (i.e., tenants), AC ¶ 33, not persons who "received" the Postcard Reports (i.e., landlords).

the grievances of the prospective class." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009).

Where, like here, a party seeks class certification under Rule 23(b)(3), "the commonality requirement 'is subsumed by the predominance requirement.'" Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 148 (3d Cir. 2008) (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627 (3d Cir. 1996)). Therefore the Court will address commonality within its predominance analysis. See, e.g., In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 266 (3d Cir. 2009) (collectively "analyz[ing] the two factors . . . with particular focus on the predominance requirement" (quotation marks omitted)).

### 3.    Typicality

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requires assessing whether: (1) the claims of the class representative are "generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory"; (2) the class representative is not "subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation"; and (3) the interests and incentives of the class representative are "sufficiently aligned with those of the class." Schering Plough, 589 F.3d at 599. Unlike commonality, which assesses the sufficiency of the class itself, typicality is designed to test the sufficiency of the named Plaintiff. See, e.g., Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). It therefore "acts as a bar to class certification only when 'the legal theories of the named representatives potentially conflict with those of the absentees.'" Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001), as amended (Oct. 16, 2001) (quoting Georgine, 83 F.3d at 631).

Here, Plaintiff argues that she satisfies the typicality requirement because her claims arise out of "the same nucleus of facts" and are based on the same legal theory as the absent class members. Thus, by pursuing her own claims, she will necessarily advance the interests of the absent class members. Id. The Court agrees.

The relevant "factual circumstances" underlying Plaintiff's claim are the same for all class members. Schering Plough, 589 F.3d at 599. Plaintiff and the proposed class members are all tenants that were "the subject of" one of Defendants' "substantially similar" Postcard Reports. See AC ¶ 33. Each Postcard Report, including the Clermont Postcard Report: (1) was generated based on the same general template and sent in the mail as an open and unsealed postcard, see Abramovitz Tr. at 8, 12, 15, 17; (2) was sent to the tenant's then-current landlord after that landlord initiated eviction proceedings against the tenant, see id. at 8–9, 11–12, 17; (3) was sent to a landlord with whom Defendants had no prior business relationship and without contacting the landlord to verify his or her identity or confirm the intended use of the information contained in the Postcard Report, see id. at 14, 18; (4) was sent for marketing purposes to solicit potential new customers, see id. at 8–9; and (5) identifies the tenant by name, discloses information about prior eviction proceedings against the tenant, and describes the tenant as a "trouble tenant" about whom Defendants could have "warned" the landlord before the landlord filed the eviction proceeding against that tenant, see Postcard Report Template; Clermont Postcard Report.

Moreover, these overlapping factual circumstances support liability under the same legal theory. Specifically, Plaintiff asserts that Defendants' decision to send out each Postcard Report represents a violation of §§ 1681b and 1681e(a) of the FCRA because the Postcard Reports are consumer reports sent out for an improper purpose—marketing—and without adherence to either the User Verification or CRA Verification procedures mandated by the Act. These violations, she

14

further claims, cause her and all class members a form of reputational harm and embarrassment. See AC ¶¶ 2, 22, 32, 45.  Because there is no "conflict" between Plaintiff's and the proposed class members' relevant factual circumstances or legal theory, typicality is satisfied.  Newton, 259 F.3d at 183; see also Bedoya, 2022 WL 3443983, at *6 (finding typicality satisfied where the plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of the class members" (quotation marks omitted)).

Defendants argue that various facts about Plaintiff's situation are "atypical" and "markedly different" from the factual circumstances of the proposed class members.  Specifically, they argue that Plaintiff (or the class) will lack the evidence necessary to uniformly address certain essential elements of their claims.  These arguments, however, "are more properly considered and relevant under the predominance . . . analysis" because the factual distinctions Defendants identify raise questions about whether common questions of fact and law are susceptible to class-wide proof. Bedoya, 2022 WL 3443983, at *6 (quotation marks omitted).  Accordingly, the Court will address these arguments in its analysis of the predominance requirement.  See id. at *6–7 (analyzing arguments that typicality was undermined because of "too many factual differences between Plaintiff[] and the putative class members" under predominance).

### 4.    Adequacy

Adequacy is satisfied if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requires analysis of two factors:  "(1) whether counsel is qualified, experienced, and able to conduct the litigation; and (2) whether any conflicts of interest exist between the named parties and the class they seek to represent."  Carrow v. FedEx Ground Package Sys., Inc., No. 16-3026, 2019 WL 7184548, at *9 (D.N.J. Dec. 26, 2019) (citing Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 312 (3d Cir. 1998)).

"[T]here is often a similarity and overlap between typicality and adequacy when determining class certification." Scanlan v. Am. Airlines Grp., Inc., 567 F. Supp. 3d 521, 533 (E.D. Pa. 2021) (citing Schering Plough, 589 F.3d at 602)). Thus, similar to typicality, the conflicts inquiry under the adequacy requirement seeks to confirm "the alignment of interests and incentives between the representative plaintiff[] and the rest of the class" to ensure that the class representative is incentivized to pursue the claims of the class. Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 183–84 (3d Cir. 2012).

Here, the Court concludes that Plaintiff's counsel is sufficiently "qualified" and "experienced" to prosecute this action. Carrow, 2019 WL 7184548, at *9. Defendants lodge no challenge to the adequacy of Plaintiff's counsel. Counsel represents that they have the independence, resources, and experience to successfully oversee this case to resolution. See Sergei Decl. ¶¶ 10, 12–13; ECF No. 75.3, Decl. of Joshua Markovits in Supp. of Pl.'s Mot. for Class Cert. ("Markovits Decl."), at ¶¶ 6, 8, 10–11. The Court also notes that Plaintiff's counsel has been certified as class counsel in, and overseen the resolution of, more than a dozen lawsuits involving various consumer protection claims and statutes. See Mot. at 8 n.2; Sergei Decl. ¶¶ 5–6; Markovits Decl. ¶ 7. This experience will allow counsel to adequately pursue the class members' interests in this litigation.

The Court also finds that Plaintiff will fairly and adequately represent the putative class. When assessing a class representative's adequacy, courts consider "the proposed representative's knowledge of the case, interest and enthusiasm for the litigation and for representing the class, her willingness to respond to interrogatories and depositions, and her understanding of the role and duties of a class representative." Bordeaux v. LTD Fin. Servs., L.P., No. 16-243, 2017 WL

6619226, at *4 (D.N.J. Dec. 28, 2017).  This requirement establishes a "relatively low bar" that, here, Plaintiff easily exceeds.  Id.

Plaintiff is the driving force behind this litigation, not her attorneys.  After she discovered the Clermont Postcard Report, she did her own research to find legal representation.  See Clermont Tr. at 8.  She also approached her attorneys with the idea of pursuing a class action lawsuit related to the Postcard Reports.  See id. at 9.  She has been counseled about and understands her general role and responsibilities as a class representative, see id. at 10–11; Sergei Decl. ¶ 11; Markovits Decl. ¶ 9, and has already proved willing to engage in discovery by sitting for a deposition, see generally Clermont Tr.  Most importantly, there does not appear to be any "conflict[]" between the interests of the Plaintiff and those of the proposed class, Carrow, 2019 WL 7184548, at *9, and she appears incentivized to represent the class members' interests, Dewey, 681 F.3d at 183–84.  Specifically, Plaintiff and the class members are "all pursuing damages under the same statute[] and the same theories of liability," highlighting an alignment of interests.  In re Cmty. Bank of N. Va. Mortg. Lending Prac. Litig., 795 F.3d 380, 394 (3d Cir. 2015); see supra at 14–15.  Moreover, Plaintiff claims common reputational harm to herself and other class members based on the open and unsealed nature of the Postcard Reports, see AC ¶¶ 2, 22, 32, 45, and has indicated she would reject individual settlement offers up to the maximum statutory damages to remedy this common wrong experienced by herself and all class members, see Clermont Tr. at 13.  She has therefore shown a clear willingness to represent the class members' interests.

Nearly all of Defendants "objection[s] to adequacy [are] the same as [their] objection[s] to typicality—that there are too many factual distinctions between the Plaintiff[] and the putative class."  Bedoya, 2022 WL 3443983, at *7.  These arguments are therefore more appropriately

addressed under the predominance analysis.[3]  The Court is otherwise satisfied that the adequacy

requirement is met.

### D.      Rule 23(b)(3) Requirements

#### 1.      Predominance

Predominance is satisfied if "questions of law or fact common to the class members

predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

Predominance is not necessary across every issue.  See Prudential, 148 F.3d at 315.  But it is

required across "the essential elements of the claims brought" to ensure that the claims "are capable

of proof at trial through evidence that is common to the class rather than individual to its members."

Reinig v. RBS Citizens, N.A., 912 F.3d 115, 127 (3d Cir. 2018) (quotation marks omitted).

To make this determination, the court must essentially "formulate some prediction as to

how specific issues will play out in order to determine whether common or individual issues

predominate." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)

(quotation marks omitted).  "In practice, this means a district court must look first to the elements

of the plaintiffs' underlying claims and then, through the prism of Rule 23, undertake a rigorous

assessment of the available evidence and the method or methods by which the plaintiffs propose

---

[3] NTN does raise one objection relevant to the adequacy inquiry.  It argues Plaintiff lacks personal knowledge regarding the alleged conduct, including about who sent the Postcard Reports, how many were mailed, who they were sent to, or how they were generated, that will prevent her from "meaningfully advancing class-wide discovery."  The argument is unavailing for two reasons.  First, it seeks to impose a far more strenuous knowledge requirement on a named plaintiff.  See, e.g., New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) (recognizing that "a minimal degree of knowledge is necessary to meet the adequacy standard" (quotation marks omitted)).  Plaintiff here has a general understanding of her claims and the law she asserts Defendants violated.  See Clermont Tr. at 11, 13.  That is sufficient to satisfy this requirement.  Second, all of the questions that NTN raises have been answered through the discovery Plaintiff's counsel has conducted to date.  See, e.g., Abramovitz Tr. at 6–7, 12–13 (LCIJ sends the Postcard Reports with data provided by NTN); id. at 14 (approximately 50,000 Postcard Reports were mailed between June 30, 2021 and June 30, 2023); id. at 8, 11–13 (Postcard Reports were sent to landlords); id. at 8, 10, 12 (Postcard Reports were generated by LCIJ based on a flyer originally drafted by NTN).  This reveals that Plaintiff retained counsel capable of pursuing and obtaining the class-wide discovery that NTN appears to view as necessary to sufficiently prove the alleged claims.

to use the evidence to prove those elements." Reinig, 912 F.3d at 128 (quotation marks omitted). The court is not, however, required to conclude that the plaintiffs will prevail—only that the question of liability can be answered with common evidence, no matter the answer. See, e.g., Vista Healthplan, Inc. v. Cephalon, Inc., No. 06-1833, 2020 WL 1922902, at *10 (E.D. Pa. Apr. 21, 2020) (explaining that "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class" (quotation marks omitted)).

Plaintiff asserts that the following questions of fact and law are common amongst all class members and are the predominate questions necessary to address the issue of liability: (1) whether the Postcard Report is a "consumer report"; (2) whether Defendants maintained reasonable procedures designed to limit the furnishing of consumer reports to the FCRA's enumerated purposes; (3) whether Defendants are jointly and severally liable; and (4) whether Defendants "willfully" violated the FCRA. She also argues that common evidence can be used to answer each question. The Court agrees.

The Postcard Reports were initially designed by LCIJ and approved for use by NTN, and both Defendants work together to update the database used to complete and send the Postcard Reports. See Abramovitz Tr. at 6–8, 10, 12. They all follow the same general template and are sent unsealed in the mail. See id. at 8, 12, 15, 17. They are all intentionally sent to landlords after Defendants confirm that: (1) an eviction proceeding has been initiated by that landlord against a tenant; and (2) the tenant was subject to a prior eviction proceeding. See id. at 8, 11–13. They each are sent to an address Defendants determine is associated with the tenant's current landlord. See id. at 8, 11–12, 17. They each state the name of the tenant, the landlord that initiated the prior eviction proceeding, and the date the prior proceeding was filed. See Postcard Report Template;

Clermont Postcard Report. They are all sent to advertise Defendants services to potential new customers. See Abramovitz Tr. at 8–9. And Defendants take no steps to verify the landlord-recipient's identity or the landlord-recipient's intended use of this information before sending the Postcard Reports. See id. at 14, 18. This common evidence will allow resolution of each of the common questions enumerated above to assess liability. Cf., e.g., Bordeaux, 2017 WL 6619226, at *4–5 (finding predominance requirement satisfied where the defendants sent "nearly identical" debt collection letters and "the merits" of all class members claims turned on whether including specific information in the letters violated the Fair Debt Collection Practices Act ("FDCPA")); see also Weissman v. Gutworth, No. 14-666, 2015 WL 3384592, at *3 (D.N.J. May 26, 2015) (finding predominance requirement satisfied where the defendants sent substantially similar letters with "specific statements" that plaintiff alleged violated the FDCPA and "every class member's claim proceeds from this factual nucleus," meaning "all claims uniformly turn on the question of whether FDCPA liability flows from Defendants' letters").

Defendants primarily challenge whether the class can prove, through common evidence, specific "essential elements" of the at-issue claims: (1) whether each Postcard Report is a "consumer report"; (2) whether each Postcard Report was "furnish[ed] to a third party," 15 U.S.C. § 1681b; and (3) whether each class member experienced an injury-in-fact caused by a Postcard Report. They argue, based on aspects of Plaintiff's situation, that certain facts relevant to these elements are likely distinct amongst the class members and that individualized inquiries will therefore be required to determine whether these elements are satisfied (which will also potentially give rise to unique defenses to certain class members' (including Plaintiff's) claims). The Court finds that none of these purported factual distinctions undermine predominance (or any other class

certification requirement).    As explained below, Defendants arguments about these factual distinctions rest on either a misinterpretation of the law or of Plaintiff's claims.[4]

### a.  Whether the Postcard Reports Were Consumer Reports.

Both NTN and LCIJ argue that Plaintiff has not provided evidence that she was applying for housing or engaged in any other credit-based transaction at the time the Clermont Postcard Report was sent, or that the Clermont Postcard Report was used to deny her housing.  They contend that Plaintiff has therefore failed to show that the Clermont Postcard Report was "used or expected to be used" for a specified purpose outlined in the definition of "consumer report," and in turn, cannot constitute a "consumer report" as defined by the FCRA.  See 15 U.S.C. § 1681a(d).  They further argue that individualized inquiries will be required to assess these issues and determine whether any other Postcard Reports identifying potential class members constitute consumer reports.

As to Plaintiff, Defendants are "invit[ing] the Court to rule on the merits."  Bedoya, 2022 WL 3443983, at *9.  But to certify a class, the movant need only "demonstrate that its claims are capable of common proof at trial by a preponderance of the evidence."  In re Lamictal Direct Purchaser Antitrust Litig., 957 F.3d 184, 191 (3d Cir. 2020).  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.    Merits questions may be

---

[4] NTN also argues that two other factual circumstances present in Plaintiff's case will also likely require individualized inquiries and give rise to potential unique defenses to certain class members' claims: (1) assessing whether the class member received the Postcard Report (based on Plaintiff not receiving a Postcard Report addressed to her); and (2) whether the information in the Postcard Report was true or false (based on Plaintiff's prior eviction proceeding referenced in the Clermont Postcard Report not ultimately resulting in her eviction).  Both factual circumstances are irrelevant to the at-issue claims.  The first circumstance is based on the same misinterpretation about the proposed class that NTN raised to oppose ascertainability.  See supra at 11 n.2.  The second circumstance is irrelevant because the alleged FCRA violations do not turn on the veracity of the information contained in the Postcard Reports.  Moreover, the Postcard Reports are limited to informing the landlord about whether a prior eviction proceeding was filed against the tenant; it does not purport to represent the outcome of that proceeding.  See Abramovitz Tr. at 9, 11–12.  Therefore, the specific information provided in each Postcard Report is true.

considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." <u>Amgen</u>, 568 U.S. at 466. Here, that assessment requires scrutinizing whether common evidence can be used to address whether the Postcard Reports are "consumer reports" in light of the objections raised by Defendants. The Court finds common evidence can be used to do so.

Defendants' argument is based on an overly-narrow reading of what constitutes a "consumer report." A "consumer report" is any "written . . . communication of any information <u>by a consumer reporting agency</u> bearing on a consumer's creditworthiness, credit standing, character, general reputation, personal characteristics, or mode of living, which is <u>used or expected to be used</u> . . . as a factor in establishing a consumer's eligibility for" certain enumerated purposes. 15 U.S.C. § 1681a(d) (emphasis added). This definition is disjunctive. In other words, to establish that information constitutes a consumer report, a plaintiff can <u>either</u> show that: (1) certain information was in fact "used" to assess their eligibility for one of the definition's stated purposes; or (2) the information was "expected to be used" in that way. If using the latter approach, because a consumer report is prepared "by a consumer reporting agency," the focus is on the CRA's expectation about how the consumer report will be used. 15 U.S.C. § 1681a(d).

Here, Defendants myopically focus on whether the Postcard Reports were in fact "used" by landlords to determine Plaintiff's (or any class members') housing eligibility. But Plaintiff's (and the class members') claims are based on whether the information in the Postcard Reports was "expected to be used" to assess the identified tenant's housing eligibility. <u>See</u> Mot. at 15–16. Plaintiff argues that common evidence can be used to show that Defendants expected the eviction-related information included on each of the Postcard Reports could be used by the landlords to make decisions related to the tenant's housing. The Court agrees.

The Postcard Reports themselves indicate that the "tenant information" they include—specifically, the tenant's name, the date of the prior eviction filing, and the name of the prior eviction filer—is the same type of information Defendants include in the "rental recommendation" reports that they prepare for customers seeking to vet new tenants and determine whether to provide them housing.  See Postcard Report Template; see also Abramovitz Tr. at 9 (confirming that the information provided in Postcard Reports is the same type of information provided in rental recommendation reports for subscribers).  Moreover, Defendants send the Postcard Reports once they confirm a landlord has initiated an eviction proceeding.  See Abramovitz Tr. at 11–12. Defendants acknowledge that filing an eviction does not mean a tenant will ultimately be evicted because, inter alia, landlords and tenants can reach a settlement or claims may lack merit.  See Abramovitz Tr. at 16–17; Graves Tr. at 24–25; NTN Operating Manual at 5.  But Defendants nonetheless send the Postcard Reports—and provide the landlord with the information about a prior eviction filing—while proceedings are potentially ongoing.  These two forms of common evidence—Defendants' own Postcard Reports and admitted understanding about the nature of eviction proceedings—could be used by the fact finder to conclude that Defendants "expected" the information included in the Postcard Reports "to be used" by landlords when making ultimate decisions related to their tenants' continued housing.  See, e.g., Kelly v. RealPage, Inc., 47 F.4th 202, 206 (3d Cir. 2022) (explaining that reports containing information about "eviction filings" prepared for "property managers" evaluating potential tenants can constitute consumer reports); see also Mot. at 16.  Accordingly, this "essential element[] of the cause of action" is "susceptible to class-wide proof."  Bedoya, 2022 WL 3443983, at *7 (quotation marks omitted).

**b. Whether the Postcard Reports Were "Furnish[ed] to a Third Party."**

Defendants separately contend that the Clermont Postcard Report was not "furnish[ed] to a third party," but rather to Plaintiff.  They also argue common evidence cannot be used to determine whether any other Postcard Reports were "furnish[ed] to a third party."  In turn, they argue that an essential element of Plaintiff's § 1681b claim is therefore not susceptible to class-wide proof.  As to Plaintiff, Defendants are again "invit[ing] the Court to rule on the merits." Bedoya, 2022 WL 3443983, at *9.  The Court will limit its inquiry to assessing whether common evidence can be used to determine whether a consumer report was "furnish[ed] to a third party." The Court finds that common evidence can be used to answer this question too.

The FCRA does not define "furnish."  But courts have explained that "furnish" means "the active transmission of information to a third-party."  In re Horizon Healthcare Servs. Inc. Data Breach Litig., No. 13-7418, 2021 WL 6049549, at *6 (D.N.J. Dec. 21, 2021) (quoting Dolmage v. Combined Ins. Co. of Am., No. 14-3809, 2015 WL 292947, at *3 (N.D. Ill. Jan. 21, 2015). Transmission means "[t]he process or an instance of sending something to another."  Black's Law Dictionary (12 ed. 2024).  The use of the adjective "active" to modify "transmission" indicates that the act of "sending something" must be voluntary and intentional.  Thus, "furnish" means the voluntary and intentional process or act of sending a consumer report to a third party.

Here, common evidence can be used to show Defendants furnished the Postcard Reports, including the Clermont Postcard Report, to third parties.  According to LCIJ's President, Defendants voluntarily and intentionally send the Postcard Reports to landlords that have initiated eviction proceedings against tenants if the tenants were involved in prior eviction proceedings. See Abramovitz Tr. at 8–9, 11–13.  They address them to the landlord.  See id. at 8–9.  And they send them to an address they determine is associated with the landlord.  See id. at 8–9.

Defendants followed this exact model with Plaintiff's landlord, Kristen Venning. After becoming aware that Venning filed an eviction against Plaintiff, Defendant (1) took steps to confirm Venning was Plaintiff's landlord, see id. at 17; (2) took steps to confirm Plaintiff had a prior eviction filed against her, see id. at 17–18; (3) took steps to determine Venning's address, see id. at 17; (4) addressed the Clermont Postcard Report to Venning at an address (the Kingsley Street Residence) that they believed was associated with Venning, see id. at 17; Clermont Postcard Report at 2; and (5) sent the Clermont Postcard Report intending for Venning to receive it, see Abramovitz Tr. at 17. Venning maintained a mailbox and retrieved mail from the Kingsley Street Residence. See Clermont Tr. at 4–5, 29–30. And the Clermont Postcard Report was ultimately delivered to that address. See id. at 16–17. Simply put, common evidence could be used to reasonably conclude that Defendants voluntarily and intentionally sent the Postcard Reports to tenants' landlords with information about the tenant's prior history with eviction proceedings. Whether Defendants "furnished" consumer reports to third parties—an "essential element[]" of Plaintiff's (and class members') § 1681b claim—can therefore be adjudicated on a class-wide basis. Bedoya, 2022 WL 3443983, at *7.

LCIJ appears to agree that the definition of "furnish" assesses the intent of the CRA sending the consumer report. It argues that the Clermont Postcard Report was not furnished to a third party, but to Plaintiff, because it "was sent to plaintiff not her landlord." That, however, is rebutted by the record, which clearly indicates Defendants intended to (and did) send the Clermont Postcard Report to Venning. See Abramovitz Tr. at 17–18. Therefore, if "furnish" is limited to assessing who the consumer report is sent to, here, the record permits a fact finder to conclude that it was "furnish[ed] to a third party." 15 U.S.C. § 1681b(a).

LCIJ nonetheless appears to also argue that to "furnish" a consumer report to a third party, the consumer report must be disclosed to a third party. But the definition of furnish (as interpreted by courts) does not require disclosure. See Horizon Healthcare, 2021 WL 6049549, at *6. In fact, caselaw cuts against this reading. Courts have repeatedly held that a consumer report that is stolen from a CRA—and has accordingly been obtained by and disclosed to a third party—is not "furnished" within the meaning of the FCRA. See, e.g., id.; In re Equifax, Inc. Customer Data Sec. Breach Litig., 362 F. Supp. 3d 1295, 1312–13 (N.D. Ga. 2019). This is because the legal inquiry assessing whether a consumer report has been "furnish[ed]" is focused on the intent and action taken by the CRA, not the disclosure of the consumer report to a third party.

LCIJ relies upon caselaw that assesses whether disclosure is necessary for information to constitute a "consumer report." But these cases do not define "furnish" to require disclosure to a third party. Moreover, the statutory definition of consumer report "does not explicitly require delivery to a third party." Neill v. Experian Info. Sols., Inc., No. 16-4326, 2017 WL 3838671, at *2–3 (D. Az. Sept. 1, 2017) (rejecting argument that a lack of disclosure to a third party meant the information at issue did not constitute a "consumer report"). And, in any event, to the extent that disclosure to a third party is required to "furnish" a consumer report, the Postcard Reports, by their open and unsealed nature, are disclosed to various third parties when transmitted through the mail. See Abramovitz Tr. at 8; accord Joseph v. J.J. Mac Intyre Cos., 281 F. Supp. 2d 1156, 1163 (N.D. Cal. 2003) (recognizing that "disclosure on the face of a[] . . . postcard reveals" the postcard's contents to "anyone who sees it").

In short, the Court concludes that whether the Postcard Reports were "furnish[ed] to a third party," and therefore whether liability arises under § 1681b, is also a common question susceptible to "class-wide proof." Bedoya, 2022 WL 3443983, at *7.

26

### c. Whether Plaintiff and Class Members Allege an Injury-in-Fact.

Defendants further argue, based on its construction of the prior two legal requirements, that Plaintiff also cannot show that she was harmed by the Clermont Postcard Report because it was not actually obtained and used by her landlord to evict her from her residence. They further press that individualized inquiries will be required to determine whether any of the other class members were harmed by the Postcard Reports. LCIJ goes so far to contend that this explicitly undermines the ability to assess standing through common evidence because Plaintiff and the class are only pursuing a "bare statutory injury" and not a "concrete injury" as required to state an injury-in-fact. This argument fails, however, because Defendants misconstrue Plaintiff's (and the class members') claims in two important respects.

First, the claim at issue is that Defendants "willfully" violated the FCRA. See AC ¶ 46. "[A]ctual damages and causation are not elements of a willfulness claim." McIntyre v. RealPage, Inc., 336 F.R.D. 422, 432 (E.D. Pa. Aug. 25, 2020). Therefore, whether any Postcard Reports caused Plaintiff or any class member to experience actual damages through the denial or loss of housing is irrelevant to the resolution of Plaintiff's (and the class members') claims.

Second, Plaintiff is not alleging that the Clermont Postcard Report caused her to be denied housing (or that any Postcard Report had that effect on any class members). She is alleging that its open and unsealed nature represented an invasion of privacy causing her—and the class members—reputational harm and embarrassment. See AC ¶¶ 2, 22, 32, 45; accord Sutton v. Fin. Recovery Servs., 121 F. Supp. 3d 309, 315 (E.D.N.Y. 2015) (explaining that a debt collection postcard exemplifies "communicating with a consumer in a manner that will cause their public embarrassment or invasion of privacy"). All Postcard Reports were open and unsealed and their contents were therefore visible to any persons that encountered them while in transit. See Abramovitz Tr. at 8. The purported harm is therefore susceptible to "class-wide proof," because

similar circumstances—the unsealed nature of the Postcard Reports—allegedly generated the same harm. Bedoya, 2022 WL 3443983, at *7.

This claimed harm also represents a sufficient injury-in-fact for standing purposes. A plaintiff asserting a violation of a federal statute does not automatically assert an injury-in-fact; they must also assert that they experienced a "concrete harm." TransUnion LLC v. Ramirez, 594 U.S. 413, 426–27 (2021). Concrete harms can be "intangible harms" including "reputational harm[]" or the harm caused by the "disclosure of private information." Id. at 425.

Here, Plaintiff asserts that Defendants have violated §§ 1681b and 1681e(a) by sending out the open and unsealed Postcard Reports for marketing purposes and without adherence to the User Verification and CRA Verification Procedures. See AC ¶¶ 27–29, 44, 46. She also claims that because all Postcard Reports label the identified tenants as "trouble tenants" for whom landlords should be "warned," Defendants' conduct has caused Plaintiff and all class members reputational harm and embarrassment. Id. ¶¶ 2, 22, 32, 45; see also Postcard Report Template. That is a "concrete injury" that satisfies the injury-in-fact requirement and can be proven through common evidence. Ramirez, 594 U.S. at 425; see also id. at 432 (holding that plaintiffs and class members whose consumer reports were disseminated to third parties in violation of § 1681e suffered a concrete injury-in-fact because their injury bore a "close relationship" to the traditional "reputational harm associated with the tort of defamation").[5]

---

[5] It is also irrelevant that many class members may be unaware of this injury. In passing the FCRA, Congress intended to "protect consumer privacy." Cortez v. Trans Union, LLC, 617 F.3d 688, 706 (3d Cir. 2010). To that end, Congress sought "to address a number of related problems, including 'the inability at times of the consumer to know he is being damaged by an adverse credit report.'" Id. (quoting S. Rep. No. 91-517, at 1 (1969)). The FCRA therefore places the onus on CRAs to adopt procedures that limit the "furnishing of consumer reports" to specific circumstances, and offers remedial relief if CRAs fail to abide by the Act's requirements. 15 U.S.C. §§ 1681b, 1681e(a). "Any interpretation of th[e] [FCRA] must reflect th[e]se objectives." Cortez, 617 F.3d at 706. To impose a requirement that consumers be aware of a potential injury caused by a CRA's violation of the FCRA to prove their claim would flout the Act's objectives. The Court therefore declines LCIJ's invitation to do so.

* * *

In sum, Defendants objections that certain "essential elements" of Plaintiff's and the class members' claims will require individualized inquiries or prompt unique defenses are based on a misinterpretation of either the FCRA's legal requirements or the at-issue claims.  Bedoya, 2022 WL 3443983, at *7.  The Court is satisfied that Plaintiff's (and the class members') claims are subject to common questions of law and fact that predominate the issue of liability and are susceptible to "class-wide proof."  Id.  Predominance is therefore met.

### 2.    Superiority

Superiority is satisfied if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This requirement seeks to "balance, in terms of fairness and efficiency, the merits of a class action against those of alterative available methods of litigation."  Prudential, 148 F.3d at 316 (internal citation and quotation marks omitted).  The rule provides a non-exhaustive list of factors to be considered when assessing superiority, which includes:  (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any similar litigation already commenced by class members; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action.  See Fed. R. Civ. P. 23(b)(3)(A)–(D); see also McIntrye, 336 F.R.D. at 439.  "Any issue determining damages does not defeat the superiority of a class action as to [Defendant's] liability."  Hargrove v. Sleepy's LLC, No. 10-1138, 2022 WL 617176, at *12 (D.N.J. Mar. 2, 2022).

Here, this requirement is easily satisfied.  Class action resolution of this case will promote individual and judicial economy.  In light of the costs associated with complex litigation and the FCRA's cap on statutory damages, class members would likely have little interest in pursuing individual actions.  The class action mechanism, however, provides the class with a cost-effective

means "to prosecute [their] claims . . . for relatively modest statutory damages." McIntyre, 336 F.R.D. at 439; see also Dinaples v. MRS BPO, LLC, No. 15-1435, 2017 WL 5593471, at *4 (W.D. Pa. Nov. 21, 2017), aff'd, 934 F.3d 275 (3d Cir. 2019) (finding superiority requirement satisfied where, inter alia, the "likely interest of class members in prosecuting claims against the Defendant individually is small, even in the case of a clear statutory violation, because [the] [] damages are capped" by statute). It will also be far more efficient for the court system to adjudicate and resolve the alleged FCRA violations in a single action compared to potentially hundreds (if not thousands) of individual actions. See Dinaples, 2017 WL 5593471, at *4 (finding superiority requirement satisfied where, inter alia, "class action treatment is more efficient than the management of myriad individual actions by consumers standing alone").

Moreover, a "majority of individuals affected by Defendant[s'] practices are unlikely to know that their rights have been violated." McIntyre, 336 F.R.D. at 439; Mot. at 32–33. "The alternative" to a class action, therefore, "would be no action at all," and that reality counsels in favor of finding the class action method to be the superior way to resolve Plaintiff's claims. Id. The Court therefore finds the superiority requirement satisfied.[6]

## V.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has satisfied each of the required class certification elements by a preponderance of the evidence. Accordingly, Plaintiff's Motion,

---

[6] NTN objects that a class action is not the superior mode of handling this case because each class members' claims depend on a number of fact-specific inquiries that will result in a series of mini-trials to determine liability. These are the same fact-specific inquiries NTN raises to object to other elements of the class certification standard (some of which continue to be based on NTN's mistaken interpretation of the proposed class). NTN's position remains unavailing. The fact-specific issues NTN raises are either irrelevant, misconstrue Plaintiff's claim, or ignore that the at-issue claims are susceptible to class-wide proof on the record before the Court.

ECF No. 75, is **GRANTED**. Plaintiff's proposed class, as defined in this Opinion and the accompanying separate Order, is hereby certified.

An appropriate Order will follow the entry of this Opinion.

Date: 01.23.2026

*s/ Madeline Cox Arleo*

**MADELINE COX ARLEO**

**UNITED STATES DISTRICT JUDGE**